ROBINETT et al. *v.* COMPTON et al.

Where one of two witnesses to an act *sous seing privé* is proved to be dead, and the other to have become disqualified, since he attested the act, by marriage with one of the parties interested under it, the instrument will be admitted in evidence on proof of the signatures of the witnesses.

Actual knowledge, by a purchaser, of an existing mortgage or title, is equivalent to a notice resulting from a registry of the mortgage or title. *Per Curiam :* If a party have knowledge of that of which it is the purpose of the law to notify him by causing an act to be recorded, he will be as much bound by his personal knowledge as if his information were derived from an inspection of the record.

In all forced alienations of property under the authority of judicial proceedings, all the delays and formalities required by law must be strictly complied with, under pain of nullity.

The return of a sheriff or other ministerial officer, in relation to sales made by him under execution, is *primâ facie* evidence between the parties. The presumption of law is in favor of the legality of their proceedings; but, like other presumptions, it must yield to contrary proof.

Where a purchaser produces a judgment, execution, and a sale made to him under it, this is *primâ facie* sufficient, and all previous proceedings will be supposed to be correct; the burden of proof will be on the party attacking them.

Previous to the stat. of 18 March, 1820, fixing the jurisdiction of Courts of Probate, the District Courts were not without jurisdiction. *ratione materiæ*, of an action against the surviving partner of a community, and the tutrix of the minor children of the deceased, to recover a' debt due by the deceased.

A sale of immovable property made under execution, on the *thirtieth* day after the advertisement thereof, was legal under sec. 14 of the stat. of 25 January, 1817. *Per Curiam :* The rule adopted at that time in computing time, was to exclude one day and include the other.

While the stat. of 18 March, 1820, relative to Courts of Probate, was in force, an action instituted in a court of ordinary jurisdiction against a curator, executor, or tutor, must have been dismissed. if excepted to for want of jurisdiction; but where judgments have been rendered, under such circumstances, without any exception to the jurisdiction, they will not be treated as nullities.

Before the promulgation of the Code of Practice, an action against a lessee did not terminate by the defendant's citing his lessor in warranty; but the only question which could be tried between the plaintiff and defendant after the lessor had been cited and made default, was that of possession.

A PPEAL from the District Court of Rapides, *Murray, J.* The facts of this case are stated at length in the opinion of the late Supreme Court, delivered by GARLAND, J., *infrâ. Dunbar* and *Edelen*, for the appellants. *Brent, O. N. Ogden, Thomas,* and *T. H. Lewis,* for the defendants.

GARLAND, J. The plaintiffs represent that they are the heirs and legal representatives of *Isaac H.,* and *Elizabeth Robinett,* the former of whom died in the month of August, 1817, and the latter in the month of November, 1819. In the month of September, 1817, an inventory of the property in community between said *Isaac* and *Elizabeth* was made in legal form, which consisted of lands, slaves, and other property, estimated at the sum of $67,610, all situated in the parish of Rapides. This estate consisted of a tract of land containing. 3,120 arpents, situated on both sides of the bayou Bœuf, and of a number of slaves named and described. They further represent that, at the date of the death of their ancestors, they were all minors; that the property to which they succeeded as heirs, could not be sold for less than its estimated value, nor in any other manner than by an order of the Court of Probates, or with their consent after arriving at the age of majority. They say that the said property has been so sold, and that they have never been legally divested of the same, but are entitled to the right and possession thereof. It is further represented, that four hundred arpents of the land, on the lower side of the tract on the left bank of the bayou Bœuf, are in the possession of *Josiah S. Johnston,* who withholds the same, to their damage $1,000; that another four hundred arpents, adjoining the above, have come to the possession of *William Armstrong,* who holds the same as agent of *John P. McNeil,* to their damage $1,000; that another part of the said tract of land, having fifteen and one-half arpents front by the depth of eighty arpents, on the left bank of the bayou Bœuf, and ten arpents front on the right bank of said bayou, with such depth as may be

found in the survey, have come into the possession of *Leonard B. Compton* and *John Compton*, who withhold the same to their damage $2,000. They further say, that six hundred and eighty arpents of said tract, having a front of seventeen arpents on the right bank of the bayou Bœuf, by a depth of forty arpents, have also come into the possession of the said *L. B.*, and *John Compton*, who occupy, and cultivate the same, and refuse to give up the possession, to their damage $3,000.

Of the slaves composing the succession of their deceased father and mother, the petitioners allege, that *John, Molly, Lucinda, Cornelia, Adeline, Chena,* and *Seraphine*, have come into the possession of *Tillman Lanier,* who detains them to their damage $2,000 ; and that *Beckey, Felicité, Mary* and *Milly,* have also come into the possession of said *Tillman Lanier*, who detains them, to their damage $2,500. The petitioners therefore pray that the aforesaid defendants may be cited to appear, and decreed each to surrender to them the aforesaid tracts of land and slaves in their respective possession, with the increase of the slaves, and that they pay the damages claimed of them.

The defendants *John*, and *L. B. Compton*, and *John P. McNeil*, for answer to the petition, after a general denial, say, that the land they are sued for, as holders in their own right, they have a good title to, derived from the plaintiffs themselves, or their ancestors, under judgments against them, and sales founded on them. They say that the judgments under which they claim title are legal and valid, are unappealed from, and are unreversed. That one of said judgments was rendered in the suit of *John*, and *L. B. Compton*, against the widow and heirs of *Isaac H. Robinett*, in the District Court of the parish of Rapides, and the other in the case of *Davis, Bynum, Johnston*, and *Curtis*, against *Elizabeth Robinett*. And *John*, and *L. B. Compton*, further answering say, as to the tract of land of six hundred and eighty acres, they are only tenants, it belonging to the heirs of *Henry Clements*, of New Orleans, whom they pray may be notified of this demand. These defendants further say, that they have each put valuable improvements on the lands in their respective possession ; that they are possessors in good faith, under a just title ; and, in case of eviction, are entitled to be paid for their improvements and expenses.

*Leonard B. Compton*, in a separate answer, says, he is the legal owner of the lands claimed of him and *John Compton*, and *John P. McNeil* ; that he acquired a title thereto from *Nelson Robinett*, who obtained a title from *Isaac H. Robinett*, the ancestor of plaintiffs; that his titles are authentic, and of record in the proper office : wherefore he prays to be quieted in his possession and title.

*Josiah S. Johnston* answered by a general denial, and further by averring that he holds the land claimed by a good and valid title ; that all the proceedings against the estate of *Isaac H.*, and *Elizabeth Robinett*, which led to his title, are regular and legal. He further says that, as the surety of *Mrs. Robinett*, he was obliged to pay $1,250, with interest and costs; that the plaintiffs, as heirs, have taken possession of the estate, and have not legally administered the same, whereby they have become liable to pay all the debts of their deceased father and mother; and he prays to hold them liable in person.

*Tillman Lanier* for answer says, that the slaves *Beckey, Felicité, Mary* and *Milly*, claimed of him, he holds as the overseer of Judge *Mathews*, who resides out of the jurisdiction of the court, and that he has no quality or right to contest the title ; and he asks to be discharged from all responsibility on account of them; and that, as to those slaves, the suit be dismissed. For further an-

swer. He says, that he is the owner of the other slaves alleged to be in his possession; that he purchased them at a sheriff's sale, made under a judgment and execution against *Nelson Robinett*, in favor of the heirs of *Henry Clements*, which judgment was obtained on a mortgage given by said *Nelson* to *Clements; that the* proceedings on said mortgage, and the obtaining of said judgment, and making said sale, were all regular and legal, and his sale is duly recorded. He further says, that the heirs of *Henry Clements* obtained a judgment for a large sum against plaintiffs, on the original mortgage given to said *Clements* by *Isaac H. Robinett,* and that under it the property has been sold to satisfy said mortgage. He further says, that, if the father of plaintiffs ever had any title to the property, he had parted with it in his lifetime; and that it was, at the time of his death, the property of *L. B. Compton;* and he asks to be dismissed.

In March, 1811, *Isaac H. Robinett* purchased, by authentic act, of *Henry Clements*, a plantation and tract of land containing three thousand one hundred and twenty arpents, situated on both sides of the bayou Bœuf, in what was known as the Indian purchase, having twenty-five and one-half arpents front on the left side of the bayou, in descending, by a depth of eighty arpents, and a front of twenty-seven arpents on the right hand side, by a depth of forty arpents; also, thirty-two slaves, of different ages and sexes, together with all the stock of cattle, horses, hogs, sheep and farming utensils, for the sum of $60,000, payable in ten annual instalments, and a mortgage was retained on all the property to secure the payment of the price. The last instalment became due on the 1st of June, 1821.

On the 1st September, 1814, *Isaac H. Robinett,* by authentic act, acknowledged himself indebted to *Nelson Robinett*, in the sum of $33,398 26, with legal interest thereon, from the 19th February, 1813, in consideration of which sum, he *(Isaac)* sold to said *Nelson* the plantation and tract of land before described, with forty slaves, comprising all except two described in the deed from *Clements* to *Isaac;* also the cattle and horses, plantation utensils, &c., with a full subrogation of rights, privileges, &c., with warranty and delivery of possession, subject to the mortgage in favor of *Clements* before mentioned, which *Nelson Robinett* agrees to pay in full, if the property conveyed to him shall be sufficient. He further stipulates, to pay to *Clements* all the proceeds of the crops every year, reserving only sufficient to support said *Isaac Robinett*, his family and establishment. And said *Nelson Robinett* further stipulates, that if *Isaac* shall, on or before the 1st day of June, 1821, pay to him the aforesaid sum of $33,398 26, with interest as agreed, that then, he *(Isaac),* "his heirs or assigns shall have the right of redemption of the said land and slaves and other property mentioned." and he *(Nelson)* obligates himself, his heirs, &c. to reconvey the aforesaid property to *Isaac,* whenever said sum should be paid.

When the aforesaid deed was made, the parol evidence proves that *Nelson Robinett* was living with *Isaac,* on the place, and that the former frequently said that the property was his, but that the latter continued to exercise control over it. On the 7th April, 1815, *Nelson Robinett* executed an act under private signature, in which, after reciting the execution of the act from *Isaac* to himself, which he calls "a mortgage," he obligates himself, under a penalty of $60,000, to reconvey all the property therein mentioned to *Isaac Robinett*, when required, and to give him possession, saying that he is not at any time to prevent said *Isaac,* or his family, from enjoying the property, he (said *Nelson*) acknowledging that he had been fully paid and satisfied, in cash and property; the afore-

said sum of $33,398 26. The above receipt or counter letter, it seems, was kept quiet, and *Nelson Robinett* continued to claim the property after its date, and to reside on the place with *Isaac,* until the period of his death, in the summer or autumn of the year 1817. Sometime after the death of *Isaac Robinett,* *Nelson* had some difficulty with his widow and family, about the sale of some cotton, when he left the place, and went to reside with the defendants, *Compton.* On the 19th January, 1818, *Nelson Robinett,* by an authentic act, in consideration of $6,000 cash, it is said, sold and conveyed to *Leonard B. Compton,* all the property mentioned and described in the deed of the 1st of September, 1814, from *Isaac Robinett,* specifying it and referring to said deed. the said *Compton* assuming all the responsibilities and stipulations assumed by *Nelson Robinett* towards *Isaac,* and also to pay the mortgage to *Clements,* as far as the property would go towards its payment. The next day after this act was passed, the receipt or counter letter above mentioned was produced and recorded in the office of the register of conveyances. It does not appear that *L. B. Compton,* under this sale, ever set up any claim to any portion of the property composing the estate or succession of *Isaac Robinett,* deceased, until the institution of this suit. He never took possession or set up a claim to it. He is proved to have been a near neighbor, well acquainted with the property, and intimate and friendly with *Nelson Robinett,* as he always had been with *Isaac* and his family ; and when the act was passed *Nelson Robinett* was living with him.

On the 25th February, 1818, an inventory of the property composing the succession of *Isaac H. Robinett,* deceased, was made by the probate judge, comprising all the property purchased from *Clements,* and every thing else included in the conveyance from *Isaac* to *Nelson Robinett,* and in the deed from the latter to *L. B. Compton,* to which no objection was made by any one. The amount was $67,610. On the day this inventory was completed, a probate sale of the property of the succession was commenced. without opposition or interruption on the part of *L. B. Compton,* who was present, and so far from setting up any claim to the estate, or any part of it, he and his co-defendant, *John Compton,* actually purchased at the sale six or seven of the slaves. as appears by the *procès-verbal* and other evidence. This sale amounted to a large sum, no part of which, so far as the record informs us, was ever claimed by *L. B. Compton* under his deed from *Nelson Robinett,* nor has he ever pursued the property in the hands of any one, nor are we aware that he ever resisted paying the price of the slaves he purchased, on the ground that he was purchasing his own property.

Sometime in the autumn of the year 1819, *Mrs. Robinett* died, and, on the 7th of December of that year, another inventory was made of the property in her possession, being the remainder of what had not been sold at the sale in February, 1818. *Leonard B. Compton* was one of the appraisers who made this inventory, and he signed it. In the *procès-verbal* the property is stated as being that of *Elizabeth Robinett,* deceased ; a great deal, if not all of it, is the same property mentioned in the deeds aforesaid ; the inventory amounted to $30,638, and *L. B. Compton* still made no claim in any manner. On the 10th of January, 1820, the probate judge, at the request of the heirs of *Isaac H.,* and *Elizabeth Robinett,* as he says, proceeded to sell publicly, at the house of *John,* and *Leonard B. Compton,* a number of slaves belonging to their succession, when the Messrs. *Compton* became the purchasers of all that were sold, being eight in number. To the *procès-verbal* of the sale of each slave, *Nelson*

*Robinett* signed as a witness ; and neither he, nor *L. B. Compton*, intimated having any title to those slaves.   On the 30th of November, 1820, another sale was made of a portion of the property of the succession by the parish judge, at which *J.*, and *L. B. Compton* were again purchasers of slaves; and still no claim was set up under the deed now presented.   A subsequent part of the history of this case will show, that *John*, and *L. B. Compton* purchased a large amount of other property that formed a part of the succession of *Isaac* and *Elizabeth*, without pretending a title to it.   We have been thus particular in setting forth all these proceedings, as they will serve to explain our opinion as to the character and effect of the deed from *Nelson Robinett* to *Leonard B. Compton*, hereafter to be noticed.

We now come to the particular titles under which each defendant, or set of defendants, claims, which it is contended divested the heirs of *Isaac* and *Elizabeth Robinett* of the property left by them, and vested it in the defendants; and we shall commence with the proceedings that led to the title set up by *John*, and *Leonard B. Compton*, to the land claimed of them in the petition.   On the 8th of May, 1818, about nine months after the death of *Isaac Robinett*, and the opening of his succession, *John*, and *Leonard B. Compton*, commenced, in the District Court of the parish of Rapides, a suit against *Elizabeth Robinett*, the widow, in her own right and as tutrix of three of her minor children, and against *Nancy Robinett*, also an heir, who had been recently married, alleging that they were the assignees of a large debt owing by *Isaac Robinett* in his lifetime, and that the said widow and heirs had become liable for it.   An answer was filed to this petition, by the curator of one of the heirs over the age of puberty, and by an attorney for the widow and tutrix and the married heiress, putting the case at issue on its merits.   A judgment was rendered on the 5th of December, 1818, for $15,262 15, with interest and costs.   An execution was issued on this judgment on the 30th June, 1819, which was levied on the land now claimed of *J.* and *L. B. Compton ;* and it being offered for sale by the sheriff, those defendants became the purchasers, on the 21st September, 1819.   The sheriff made a deed to them for the land, and under it and the previous proceedings, they now claim it, saying that it has been taken in payment, to the extent of $7,600, on their judgment.

We now proceed to state the immediate titles to *J. S. Johnston* and *John P. McNeil.*   Under the aforesaid judgment of *J.* and *L. B. Compton*, against the widow and heirs of *I. H. Robinett*, an execution was issued and levied on eight hundred arpents of land, being the lower part of the *Robinett* tract, on the left side of the bayou, which, on the 18th June, 1819, was purchased, on twelve months' credit, by *Elizabeth Robinett*, at the sale made by the sheriff.   She gave a twelve-months' bond for the price, $4,500, and the sheriff made her a deed.   Before this bond became due, *Elizabeth Robinett* died.   After her death it was transferred to *A. J. Davis*, *Francis Bynum*, *J. S. Johnston*, and *George B. Curtis*, who were sureties on it, and had paid it.   About the 8th of December, 1820, the last named parties presented a petition to the District Court of the parish of Rapides, stating that they were the assignees of said bond ; that *Mrs. Robinett*, the maker, was dead ; that they were subrogated to the rights of the obligees, and entitled to have an execution issued on it ; wherefore they pray that said judgment and bond be revived, and made executory against her heirs.   The husband of the married heiress, who was curator *ad bona* of one minor, and tutor of two others, acknowledged service of this petition, and con-

fassed that the allegations were true; whereupon, it was decreed by the court, that the judgment and bond be revived against the aforesaid heirs, and declared executory. There seems to have been but little delay or formality about this matter, and, abount nine months after, an execution was issued in favor of the said *Davis* and others on said bond; and under it, in November, 1821, four hundred arpents on the lower side of the tract, on the left side of the bayou, were sold by the sheriff; and, under that sale, *Josiah S. Johnston* claims the land alleged to be in his possession. The full amount of the aforesaid bond not having been paid by the said sale, another execution issued, in the same form, in March, 1822, and under it another tract of four hundred arpents of land adjoining the last mentioned, on the upper side, was seized and sold by the sheriff, on the 27th of April, 1822, and a deed made to the purchaser, under which *Mc-Neil*, the defendant, now claims the land he is sued for in this action.

The remaining portion of the original *Robinett* tract of land, containing six hundred and eighty arpents, claimed of *John*, and *L. B. Compton*, who say they have no title to it, but hold as tenants under the heirs of *Clements*, came to them in the following manner: About the 24th of April, 1822, the heirs and legal representatives of *Henry Clements*, commenced a suit on the original act of sale and mortgage, passed between *Henry Clements*, and *Isaac H. Robinett*, in 1811, in the District Court of the parish of Rapides, against *Nancy Robinett* and her husband, who was also the curator *ad bona* of one minor and tutor of the two others, as heirs of their father, claiming a balance as due on the said sale and mortgage, and also demanding $617.50, as owing on open account by *Isaac Robinett*, in his lifetime, to *Henry Clements*. A judgment for the balance due on the mortgage, and for a sale of the property hypothecated, is prayed for, and also a judgment for the amount of the open account. The married heir, her husband, the curator *ad bona*, and the tutor, are prayed to be cited; and it is asked that a curator *ad litem* may be appointed to represent the minor over the age of puberty; but the record does not show that it was done. The defendants appeared by an attorney, and filed an answer to the merits, and, in May, 1822, a judgment was rendered for the sum of $8,597 40, with interest at ten per cent from June 1st, 1821, to be made out of the mortgaged property; and a further judgment for $617 50. with legal interest from judicial demand, the amount of the open account. On this judgment, an execution was issued on the 30th of September, 1822. under which the tract of land of six hundred and eighty arpents was seized, being a portion of the property mortgaged; and, on the 3d December, 1822, it was sold by the sheriff, when an agent of *Henry Clement's* heirs purchased it for them, for $5,900; and they hold under that sale.

We now come to the title under which the defendant *Lanier* holds the slaves claimed of him. On the 16th of September, 1815, whilst *Nelson Robinett* was pretending to have a title to all the estate, under the deed or instrument passed between *Isaac H. Robinett* and himself, he mortgaged to *Henry Clements*, the slaves *John, Molly, Betsy, Becky, Mary, Louisa, Chena, Stephey, Adeline*, and *Seraphine*, for purposes in that act mentioned. This mortgage, it is said, was a security for a part of the old debt of $60,000, owing by *Isaac H. Robinnett* to *Clements*, which *Nelson Robinett* had assumed to pay. Wherefore, on the 8th of November, 1823, the heirs of *Henry Clements* commenced a suit on this mortgage against *Nelson Robinett*, claiming a balance due on the old debt of upwards of $4,000 and interest; they prayed for a judgment against him, and that the aforesaid slaves be sold to satisfy it. Service of this petition was acknow-

ledged, and, in a short time after, a judgment by default was made final for $4,181, with interest, and a decree made that the slaves mortgaged be sold to satisfy the judgment. An execution was issued on this judgment, and, under it, the slaves mortgaged, with their increase, were seized, and a part of them sold by the sheriff, on the 10th of February, 1824. At this sale *George Mathews* purchased the four slaves named *Beckcy, Felicite, Mary,* and *Milly,* now claimed of *Tillman Lanier,* to whom, he says, he has no title, but has them in possession as *Mathews'* overseer. The said *Lanier,* at the same time, purchased the two slaves, *Adeline* and *Seraphine,* now claimed of him, and subsequently, under the same judgment, and another execution issued in consequence of the first expiring, he purchased by himself and another person, the slaves *John, Molly, Lucy, Cornelia* and *Chena,* and upon the adjudications and sales by the sheriff, he bases his claim to hold the said slaves. This defendant further, to sustain his claim acquired as aforesaid, produces a petition of the heirs of *Clements,* addressed to the district judge, again setting forth the mortgage from *Nelson Robinett* to said *Clements,* and the fact of a judgment being obtained on it, as already stated, and further, that the slaves named had been alienated by said *Nelson,* and were then in possession of *Hampton Cheney,* and the nominal title in *Leonard B. Compton;* wherefore he prays for an order of seizure and sale, after giving ten days' notice to *Cheney* and *Compton.* The judge of the district gave the order or decree; but no other process was issued on this petition except what is mentioned, and notice was given to *Cheney* and *L. B. Compton,* as the sheriff states in his return.

On this evidence, the judge of the district gave a judgment in favor of all the defendants generally, in May, 1825, when an appeal was taken by the plaintiffs, and it has ever since been pending in this court, a portion of its members being always interested as parties or as counsel.

The first question to which our attention is called, is presented by a bill of exceptions taken by the defendants, to the admission as evidence of the receipt, or counter-letter, given by *Nelson Robinett* to *Isaac H. Robinett.* The witnesses to this instrument were *W. P. Cannon* and *Hampton J. Cheney;* the former was dead at the time of the trial, which fact, and his signature, were proved; and it was shown that *Cheney* had become disqualified by being married to *Nancy Robinett,* one of the plaintiffs, and being also the curator *ad bona* of one of the minors, and the tutor of the others. His signature was proved to be genuine; yet the defendants insisted that the instrument was not sufficiently proved, and objected to it. We are of opinion that the judge did not err in receiving the document as evidence. It having been proved that *Cannon* was dead, parol evidence of the genuiness of his signature was all the evidence the plaintiff could give. The man could not be raised from the tomb to testify, and the plaintiffs should not be injured by an event they could not control or prevent. As to *Cheney,* he had become disqualified by his marriage with one of the plaintiffs; therefore proof of his signature was, in our opinion, sufficient. If the defendants had any doubts as to the genuiness of his signature, they might have interrogated him on facts and articles, or they could have been admitted to prove, by other testimony, that the signature of *Robinett,* was not genuine, although the signature of the witness was so.

Proceeding to the merits of the case, we shall first dispose of the separate defence of *Leonard B. Compton,* based upon the conveyance from *Nelson Robinett* to him, under which he attempts to protect himself, and under which

ROBINETT
v.
COMPTON.

some of the other defendants wish to take shelter. The argument upon both sides has been much more extended on the character, weight and effect of this instrument, than upon all the other points in the case, yet we think it ought not to have any influence in its decision. The defendants contend that, as the receipt or counter-letter from *Nelson* to *Isaac Robinett* was not recorded previous to the conveyance from the former to *L. B. Compton*, he was ignorant of it, and of the character of the transaction between the two *Robinetts*, and was therefore a purchaser in good faith, without notice, and for a valid consideration, and that consequently the plaintiffs are divested of all title, or claim, by the act of their ancestor.

The doctrine is now well settled, that the actual knowledge by a purchaser of an existing mortgage or title, is equivalent to a notice resulting from the registry. The formality of recording is for the benefit of the public, and for the purpose of giving notice to individuals. 8 Mart. N. S. 140, 246. B. & C.'s Digest, 597. But if a party have knowledge of that, of which it is the purpose of the law to notify him, by causing an act, instrument, or lien to be recorded, the effect is the same, and he is as much bound by his personal knowledge, as if his information was derived from an inspection of the record.

We are fully satisfied that *Leonard B. Compton* knew perfectly well the character of the transaction between *Isaac*, and *Nelson Robinett*, and an impartial examination of the record cannot leave a doubt on any mind, not predetermined to disbelieve it, or to smother the belief under legal technicalities. We have stated the facts, as to the relations between *L. B. Compton* and both the *Robinetts*. *Nelson* came to the country a short time before the conveyance made by *Isaac* to him; he had little or no visible property or means. Suddenly a debt for more than $33,000 is acknowledged as due to him; a large amount of property is conveyed to him, over which he exercises little or no control during the lifetime of the party conveying it; and, soon after his death, he leaves the place in consequence of some rupture with the family, and makes a sale, apparently for $6,000 cash, after which period no one ever sees him with but a few dollars in money, and that, from the testimony, was probably derived from the sale of the cotton, which produced the difficulty with the family. The party, who it is said paid this $6,000 in cash, and who had promised to pay off a mortgage of $60,000 more, if the property should be worth so much, never makes any effort to take possession of it; never sets up a claim to it, although living in the immediate vicinity; and in a few weeks after, attends a public auction, when it was offered for sale, becomes himself a purchaser, and permits others to buy, without advancing a claim. He assists at an inventory and signs his name to a public act, which states that the property belonged to the succession, against which he now claims it: and finally, sues the representatives of that succession for a debt owing by it, alleging the fact of the property having gone into the hands of the widow and heirs, whereby they were liable to pay the debt; obtains a judgment; and then has that property, now said to be his, seized and sold to pay it. It is absurd to suppose and too incredible for belief, that a man would seize and sell his own property, to pay his own debt. This the counsel for the defendants call on us to believe that *Leonard B. Compton* did; and further, that he never made an effort to manage the property by administering it himself, or to have it properly managed by another, so as to pay the mortgage debt to *Clements'* heirs, with as little loss as possible; but on the contrary, he and his co-defendant *John Compton*, who, it appears, was the agent

of the heirs of *Clements*, were forcing sales under executions by the sheriff.

The foregoing statement is a brief recapitulation of some of the leading facts relating to this part of the case ; but the record is full of the most conclusive evidence, that *Leonard B. Compton* was fully informed as to the true character of the conveyance under which he pretends the plaintiffs have been divested of title; and we are of opinion that he is as much bound by the receipt or counter-letter, dated April 7th, 1815, from *Nelson* to *Isaac Robinett*, as *Nelson* himself would be, if he was a party to this suit.

We therefore pass from this branch of the defence, believing it untenable, and proceed to examine the other means by which it is contended that the plaintiffs have been divested of that title which their ancestors had to the property now in controversy. The defendants say, that title has been divested by sales legally made by different sheriffs of the parish of Rapides, under executions issued on regular judgments, obtained in a competent tribunal, to pay debts owing by those ancestors; and that those sheriffs have made regular deeds to them, or those under whom they hold. If these positions can be established, the judgment of the District Court must be affirmed.

Before proceeding to the questions in detail, it may be well to remark that, as a general principle, in all forced alienations of property, under the authority of a judicial proceeding, all the delays and formalities required by law must be strictly fulfilled under pain of nullity. It is also well settled, by repeated decisions of this court, in relations to sales made by the sheriffs and other ministerial officers under executions, that the return of the officers are to be taken as *primâ facie* evidence between the parties. The presumption of law is in favor of the legality of the officer's proceedings; but, like all other presumptions, that in favor of the officers of justice, must yield to evidence adduced to the contrary. It is further well settled in our jurisprudence, in relation to sales under execution, that when a purchaser shows a judgment, an execution, and a sale to him under them, made by a proper officer, it is *primâ facie* sufficient, and all previous proceedings are supposed to be correctly made, and the burden of proof is on the party attacking those proceedings. 6 La. 628. 9 Ib. 1542. 8 Martin, 682. 4 La. 473. 8 La. 423.

Keeping the general principles we have stated in view, we will first examine the title set up by *John*, and *L. B. Compton.* It will be recollected that they present a judgment of the District Court against the widow *Robinett*, in her own right, that is, as a surviving partner in the community, and as the tutrix of her minor children, obtained in the year 1818, upon which an execution was issued, and under it a sale was made by the sheriff, in 1819. To this, it is replied : *First*, that the court that gave this judgment was without jurisdiction and incompetent to give the judgment, as it was against a tutrix and the minors she represented ; and *secondly*, that if the judgment was rendered by a competent court, the sheriff did not proceed legally under the execution, and give the proper notices of seizure, and advertise a sufficient number of days, before proceeding to sell the land in possession of the defendants.

First, as to the jurisdiction of the District Court, to give a judgment against a succession, administered by a natural tutrix, acting in her own right and as the representative of her minor children. Previous to the passage of the act of 18th March, 1820, (Sess. Acts, p. 92) fixing the jurisdiction of the Courts of Probate in the State, it seems to have been settled by various decisions of this court that the District Courts were not deprived of jurisdiction *rationc*

*materiæ,* in such cases. The question was fully considered in the case of *Tabor* v. *Johnston et al.* 3 Mart. N. S. 674.   6 Ib. N. S. 548.   7 Ib. N. S. 376.   8 Ib. 241.   8 La. 421.   The practice was, we believe, almost universal, to bring suits against successions in the District Court, and we are not prepared to say it was erroneous.   We shall speak of the provisions of the act of 1820 under another branch of this case, it having no effect upon the judgment obtained by the Messrs. *Compton* previous to its passage.   The widow and heirs of *Isaac Robinett* having permitted a judgment to be rendered against them, without excepting to the jurisdiction of the court, having filed an answer to the merits, we are of opinion that it is not absolutely null, and possibly not relatively so; wherefore we shall hold it valid and obligatory until legally annulled.

As no objection has been taken to the form or manner of issuing the execution, we shall proceed to the mode of executing it.   The sheriff received it on the 2d of July, 1819.   On the 28th of that month, a seizure was made, and, on the 3d of August, the property was advertised for sale on the 2d of September following, on which day it was not sold; and on the 3d it was again advertised to be he sold on twelve months' credit, on the 21st of September, when the defendants purchased it, in part payment of their judgment, and a deed in regular form was made to them by the sheriff.

The 14th section of the act of 1817 (Sess. Acts, p. 34) relative to the organization of the courts of the State and for other purposes, was in force at the time this sale was made.   It provided, " that in no case, except in cases of judgment by default, shall it hereafter be necessary for the sheriff to give notice to the defendant to pay the money due on an execution, before proceeding to levy the same; and no sale of moveable property seized by the sheriff shall be made in less than ten days, nor slaves and immovable property in less than thirty days, from the day of first advertising."   The act then proceeds to say that the sheriff shall offer the property for sale on the day fixed, and if no person will give two thirds of the appraised value, it shall not be sold; but shall be advertised for sale on a credit of twelve months, and shall be sold, after fifteen days notice, &c."   In this case, there can be no question as to the sufficiency of the time of advertising preceding the sale.   It was more than fifteen days, and the only question is, whether the first advertisement was sufficient.   The law said, the property should not be sold in less than thirty days.   The property was offered for sale on the thirtieth day after the day of advertisement, which we think sufficient under the then existing law.   That it would not be legal since the adoption of the Code of Practice, is probably true; but we cannot say that when an act is performed on the thirtieth day from a fixed period, that it is done in less than thirty days.   The rule of computation then existing in relation to time, was to exclude one day and include the other; it may be different now, but on that point it is not necessary to decide at present.

We are therefore of opinion, that the judgment in the case of the *Comptons* against the widow and heirs of *Robinett,* is not absolutely null.   It was not a judgment by default; no notice to the defendant in it, to pay the money previous to proceeding to levy the execution, was necessary under the statute; the term of advertising was sufficient; and the sale therefore legal, and confers a valid title on the defendants.

The defendants *Johnston* and *McNeil* claim under the judgment of the *Comptons* also.   An execution having issued on it, went into the hands of the sheriff, on the 27th of April, 1819.   On the 30th he made a seizure, and the land was

offered for sale on the 2d of June following. The sheriff does not say on what day he put up the advertisement; but he says, "the said land being advertised for sale agreeable to law, the same was exposed to public sale." This return of the officer the law presumes to be true, until the contrary is shown; and there is no evidence to contradict it. There was more than thirty days from the date of the seizure to the day of sale, and also more than fifteen days between the first and second exposure by the sheriff, who says he again advertised the property, and, on the 18th of June, 1819, Mrs. Robinett became the purchaser on twelve months' credit, and the sheriff made a sale to her. This sale, we think, is so far legal. When the twelve months' bond given by the mother of plaintiffs became due, she had been dead several months, and it was assigned to *Johnston, Davis, Bynum* and *Curtis*, who it is understood were the sureties on it, and had it to pay. They commenced proceedings in the District Court, to have the bond, which had the force and effect of a judgment, revived and made executory, and we have seen that it was ordered, on the acceptance of the service of a petition, and a confession of the truth of its allegations, by *Hampton J. Cheney*, the husband of *Nancy Robinett*, and the curator of one minor and the tutor of the others. On this judgment of revival an execution was issued, which came into the hands of the sheriff, on the 21st of September, 1821, who gave a written notice, and made a demand of payment, on the 27th of September; a seizure was made on the 3d of October, and advertisement made on the 4th, of the sale to take place on the 5th of November, 1821, when the four hundred arpents of land claimed by *J. S. Johnston*, were sold, and purchased by him and his co-defendant *McNeil*, under whom he holds it. The proceeds of this sale, not being sufficient to discharge the amount of the bond given by *Mrs. Robinett*, another execution was issued, on the 15th of March, 1822, which came into the hands of the sheriff the next day, who, on the 20th, made a demand of payment and gave a written notice, and, on the 25th, made a seizure of the four hundred arpents of land claimed of *McNeil*, which, on the same day, were advertised for sale on the 27th of April following, when they was sold to *John H. Johnston*, under whom *McNeil* holds by an undisputed conveyance. In these cases, more than thirty days elapsed from the day of advertising to the time of sale in each case, and there is no sufficient reason for setting them aside, unless the District Court was absolutely without jurisdiction, *ratione materiæ*, and had no authority to revive the twelve months' bond and judgment it imported, and cause it to be made executory; and we now come to the decision of this question.

The act of 1820 relating to the jurisdiction and forms of proceedings in Courts of Probate, says that those courts "shall have jurisdiction in all cases which relate to the proof and execution of wills, the appointment of curators of vacant estates, absent heirs, minors, and other persons, tutors of minors, the settlement, liquidation and partition of successions, the liquidation and payment of all claims against a succession, either vacant or accepted with the benefit of inventory, &c."; in consequence of which, this court has held, in various cases, that, where curators of vacant estates, executors, or tutors of minors, have been sued in the ordinary tribunals, they could except to the jurisdiction, and their plea would be sustained. The case of *Vignaud* v. *Tonnacourt's curator*, 12 Martin, 229, was the first that came up, after the act of 1820; and this court decided against the jurisdiction of the District Court. Similar doctrines were promulgated in the case of *McDonogh* v. *Johnson's executors*, 2

ROBINETT
*v.*
COMPTON.

Mart. N. S. 287; and in that of *Baillio &c.* v. *Wilson,* 3 Mart. N. S. 73–74, and in some other cases; but we are not aware that, even since the act of 1820, this court has ever gone so far as to decide that a judgment rendered by a District Court against a succession, or minors represented by their tutor or tutrix, without exception or objection, was absolutely null. It is possible such judgments may be annulled, if proper cause be shown; but we are not prepared to declare them absolutely so, particularly when rendered upon the confession of the heirs or legal representatives of the deceased. These views of the case induced us to come to the conclusion, that the title vested in the defendants *Johnston* and *McNeil,* by the proceedings had under the order or judgment of revival on the twelve months' bond, cannot be disturbed, as that order or judgment has never been reversed or annulled.

As to the slaves in the possession of *Lanier,* another defendant, the plaintiffs show no other evidence of title to them, than producing an inventory, on which these slaves are placed as belonging to the estate of their father and mother. The slaves were mortgaged to *Clements* by *Nelson Robinett,* for a purpose mentioned in the act. They do not appear to be a part of those purchased by *Isaac H. Robinett* of *Clements,* and transferred to *Nelson Robinett.* They are not named in that deed; and nothing shows that *Isaac H. Robinett,* in his lifetime, ever had such slaves; and the mere fact of putting them on an inventory, does not give such a title as can be enforced against a third possessor and innocent purchaser. It is true the slaves were sold to pay a debt of the estate of *Isaac H. Robinett;* but they were mortgaged by *Nelson,* who, at the time, was in some degree bound for the same debt; and if they ever did belong to *Isaac H. Robinett,* it is not impossible they were the property he gave to *Nelson* in payment, when he gave him the receipt in 1815. We are of opinion that the court did not err in rejecting this part of the demand of the plaintiffs. as this defendant never set up any title as derived from their ancestor, but constantly denied it.

We now come to the claim made against *John,* and *Leonard B. Compton* for six hundred and eighty arpents of land, and the improvements thereon, on the right side of the bayou Bœuf. In their answer, as we have stated, they said that they had no title to it; that they were tenants of the heirs of *Clements,* who resided in New Orleans out of the jurisdiction of the court, to whom the land belonged; and they prayed that said heirs might be notified and called on to defend the suit. The court did not order those lessors and heirs to be notified, and give time therefor, as should have been done; but, at the return term of the case, tried and decided it; and, among other things, seem to have decided that the court was without jurisdiction as to those heirs and lessors, as it says " that a free-holder cannot be sued out of the parish in which he has his domicil." This decision was made before any exception to the jurisdiction was made, and as the plaintiffs have not, in their appeal, made the heirs of *Clements* parties, nor complained of the decision refusing to call them to defend the suit, it remains for us to inquire in what position the parties stand, and what we have to decide on. It certainly cannot be on the title between the plaintiffs and the heirs, because they are not before us; and there is a decree saying they cannot be sued out of the place of their domicil if they are freeholders, of which fact we are not informed. The tenants say, they have no title, and do not pretend to any; therefore no decision can be given upon it that will be conclusive against any one. The question then occurs, what was the issue the court be-

low did try between the parties before it? The record does not exactly tell us, but we must presume that it only tried such as the law permitted; and to ascertain what it was, it becomes necessary to ascertain how the case stood after the tenants made their disclaimer of title. If, by the disclaimer and notification of the names of the lessors in their answer, the parties in possession were necessarily discharged, that would be an end to the case, if the court refused to cite those lessors; but that we believe was not the law at the time this case was tried, whatever it may be since the adoption of the Code of Practice. The question whether, in an action against the lessee, the cause terminated by the defendant citing his lessor in warranty, came up in the case of *Kling* v. *Fisk*, 4 Mart. N. S. 391; and, after much consideration, it was held, that the action did not terminate, but that the only question that could be tried between the plaintiff and defendant, after the lessor was cited and made default, was one of possession. The same doctrine was maintained in the cases of *Fusilier* v. *Hennen*, and *Bayoujon's Heirs* v. *Criswell*, 5 Mart. N. S. 71, 232.

The foregoing statement of the pleadings and legal positions being correct, it follows that the only question that could be at issue between the plaintiffs and the *Messrs. Compton*, was one of possession, and the evidence that was introduced we suppose had reference to it. An examination of that testimony shows that, more than two years before the institution of this suit, the sheriff had made a sale of the land under execution, (whether legally or not, it is not now necessary to decide,) and put the defendants, or their lessors, in possession. If the plaintiffs had wished to put the defendants out of possession merely, the law, as it then stood, afforded a ready means of doing so, when the latter disclaimed title. 4 Mart. N. S. 495. Partida 3, title 2, law 29. But as they thought proper to rely on evidence to establish their right of possession, it seems to us they have not succeeded, and the court below was not in error in giving a judgment for the defendants, so far as it related to that question; and we cannot assume that any other was decided.

To four of the slaves in the possession of *Lanier* he disclaimed title, and said that he held them for *George Mathews* of New Orleans, who, he said, was beyond the jurisdiction of the court, and asked that he might be notified. The court below decided in the same way as in relation to *Clements'* heirs, and a similar result followed. The two branches of the case are similar, in all respects; and our opinion is the same as to both. The inferior judge did not therefore err in his judgment.

It is therefore ordered and decreed, that the judgment of the District Court be affirmed, with costs; reserving to the plaintiffs any rights they may have against the heirs of *Henry Clements*, or against *George Mathews*, not precluded by this judgment; the plaintiffs paying the costs of this appeal.

---

*Dunbar* and *Edelen*, for the appellants, prayed for a re-hearing in this case, on the grounds: 1st. That all the property sued for, was, at the time of the respective sales under which the defendants claim, subject to a special mortgage in favor of *Clements'* heirs for the sum of $60,000; and that the price bid at none of said sales was sufficient to satisfy the same. 2dly. That in making said sales the formalities prescribed by law were not complied with.

I. The express mention of the fact in the sheriff's deeds is sufficient evidence of the existence of the mortgage. *Mounot* v. *Williamson*, 7 Mart. N. S. 384. The act of 1817, sec. 16, provides that the sheriff, before making any sale on a writ of *fieri facias*, shall produce the certificate of the register of mortgages, stating whether there be any mortgage on the property offered for sale, and, if any, to what amount. By sec. 17, it is further provided that the proper-

ROBINETT
v.
COMPTON.

ty shall be sold subject to the payment of such mortgages by the purchaser. The phraseology of this act will admit of but one construction, which is, that to become the purchaser at a sheriff's sale of property subject to a previous special mortgage, it is necessary to assume a personal liability for the mortgage debt. This is the construction adopted by the court in *Balfour* v. *Chew*, 4 Mart. N. S. 162, and in the case above cited in 7 Mart. N. S. 384. We are sustained by these two cases, and that of *DeArmas* v. *Morgan*, 3 Mart. N. S. 604, in these two positions : 1st. That it is essential to the validity of a sheriff's sale, that the price offered should be sufficient to discharge the mortgages previously existing on the property ; 2dly, that the purchaser should become personally liable for the mortgage debt. The next question is one of fact. Were these different sales made subject to the payment by the purchaser of *Clements'* mortgage ? Did these purchasers become, or intend to become, personally liable for that mortgage debt ?  " A bid at a sheriff's sale is a bid for the absolute value of the property ; and, when it is encumbered, is not a bid over and above the encumbrances." 4 Mart. N. S. 161. The facts of the case are in conformity with this legal presumption. We find this mortgage is mentioned in each successive deed of the sheriff, until finally, in December, 1822, a portion of the land subject to it and still belonging to the plaintiffs in this action, is sold to pay the balance due upon it. The sheriff's deed to *J.* and *L. B. Compton* sets forth that they became the purchasers for the sum of $7,600. Nothing is said of its being over and above the special mortgages. Towards the close of the same deed it is said that the land is subject to a mortgage to *Clements*. The language is the same in all the other deeds. It is obvious, then, that it was never in the contemplation of either the sheriff, or the purchasers, that the latter should become personally liable for the mortgage in question. It is true that the price given for the property was applied by the sheriff to the satisfaction of the executions; but this is perfectly consistent with the view, no doubt then entertained, and still entertained by many, even of the profession, that the sale is valid although the sum for which the purchaser becomes absolutely bound be less than the previous mortgage—that sum to be applied to the extinction of the execution ; and the land, not the purchaser, to remain subject to the mortgage. This impression is in direct conflict with the language of the act and the decisions above referred to, and all the subsequent decisions on the same subject. If it be true that the purchasers under the different sales offered in evidence in this case, did not become personally responsible for the amount of the previous mortgages, it is scarcely necessary to inquire, whether it is the amount apparently due on the mortgage that it is necessary the price offered should be sufficient to discharge, or that which is really due. That the latter would be erroneous, it is easy to show. The 16th and 17th sections of the act of 1817, were intended to regulate the course of the sheriff on the day of sale. He could then only know what was apparently due on the mortgage, the certificate of the parish judge being his only legal guide. The discovery of what was really due, if less, would necessarily be an event subsequent to the day of sale, and therefore could not influence his action on that day. If, however, we are in error in this, there is no proof in the record of what was the amount really due on *Clements* mortgage, until May, 1822, after all the sales had taken place.

The sale to satisfy the balance due on *Clements'* mortgage was in *violation* of the act of 1817, if the previous sales were made in conformity to the 16th and 17th sections.

The reasons on which the rule is founded that a probate sale frees the property from the mortgages existing on it, are wholly inapplicable to a sheriff's sale, made to satisfy a judgment obtained in the District Court by a creditor in the separate pursuit of his claim. These reasons are set forth in *DeEnde* v. *Moore*, 2 Mart. N. S. 336.

1I. It is conceded that a sale on the thirtieth day from the day of advertising may not be less than thirty days from the time or hour of the advertisement; as if an advertisement were put up at 12 o'clock on the 3d of August, and the sale was made at 1 o'clock on the 2d September. But in the first place, the words of the act are " from the day of first advertising", which unquestionably excludes the day on which the advertisement is made; secondly, the law takes no notice of fractions of days. The question then seems to be, whether the court should adopt an erroneous calculation because it is a prevalent one.

On the petition for a re-hearing, the court, through GARLAND, J., endorsed these words: "Granted on the first point alone, which relates to the defendants, the *Comptons*, and *Johnson* and *McNeil* only, and the lands claimed of them. As to *Clements* heirs, *Mathews* and *Lanier* no re-hearing is asked, and the judgment is final."

ROBINETT<br>v.<br>COMPTON.

## SAME CASE—ON A RE-HEARING.

A sale of property, subject to a special mortgage, made, under the laws in force anterior to the promulgation of the Code of Practice, without fraud or collusion, will not be set aside at the instance of the mortgagor or his heirs, though the property did not sell for enough to satisfy the nominal amount of the encumbrance, where the debt had been in fact greatly reduced at the time of the sale, and the mortgage creditor, having been paid by subsequent sales of other property included in the mortgage as liable for his debt, does not complain of any injury therefrom, nor objects to the application of the proceeds to the extinguishment of other debts.

*Dunbar* and *Edelen*, for the appellants. The court will find, on an examination of the returns and deeds, first, that at the time of these respective sales there was a special mortgage on all the land, in favor of *Clements*, for the sum of $60,000, having a preference over the judgment creditors; and secondly, that these lands were not sold subject to the payment of such mortgage by the purchaser, and that the respective prices for which they were adjudicated were not sufficient to discharge the mortgage.

The express mention of the mortgage in the sheriff's deed is sufficient evidence of its existence and amount. *Mounot* v. *Williamson*, 7 Mart. N. S. 384. The sheriff's return and his deed must be evidence, equally sufficient, of the price for which the property was adjudicated. There is, then, conclusive evidence of the only two material facts: the existence and amount of the mortgage, and the non-assumption of the mortgage by the purchaser, or the insufficiency of the price to satisfy the mortgage debt. It may be contended that the evidence referred to does not prove that the property was not sold subject to the payment of the mortgage debt by the purchaser. If so, we reply, that a bid at a sheriff's sale is a bid for the absolute value, and not a bid over and above the encumbrances. *Balfour* v. *Chew*, 4 Mart. N. S. 161. This is the legal presumption in the absence of contradictory proof, and nothing not absolutely conclusive should be deemed sufficient to rebut it. The facts of this case, so far from being inconsistent with this presumption, are in perfect conformity with it.

Two opinions have been entertained in connection with this subject, which ought not, perhaps, to be entirely passed by. The first is, that a sheriff's sale of encumbered property is valid, no matter how small the price in comparison with the encumbrance—the land, not the purchaser, to remain subject to the mortgage debt. The other opinion referred to is, that it is sufficient to render a sheriff's sale of encumbered property valid, that the purchaser should make himself by his bid personally liable for the amount actually due upon the mortgage, though greatly less than is set forth in the certificate of the parish judge. Both of these opinions, it is presumed, are wholly erroneous. The language of the 17th section of the act of 1817 is, that "the property shall be sold subject to the payment of such mortgage by the purchaser." This would seem to admit but of the construction, that to become the purchaser at sheriff's sale of property subject to a special mortgage having a preference over the judgment creditor, it is necessary to become personally liable for the mortgage debt. Such is the construction adopted by the court in the two cases above cited, reported in 4 Mart. N. S. 162, and 7 Mart. N. S. 384, and in many others since decided. The language and the objects of the act of 1817 are alike irreconcileable with the second of the above opinions. The 16th section requires the sheriff, before proceeding to the sale, to produce to the bidders a certificate of the register of mortgages, stating whether there be any mortgages on the property offered for sale, and, if any, to what amount? The next section requires that the property shall be sold subject to the payment of such mortgage by the purchaser. The objects of the act in requiring the sheriff to produce the cer-

ROBINETT
v.
COMPTON.

tificate. of the parish judge, must have been, first, to make known to the bidders what was the amount of the debt (if any) it would be necessary for them to assume, in order to become purchasers of the property offered ; and secondly, to regulate the action of the sheriff in reference to the sale—to be his guide in determining whether to adjudicate the property or not. If these were the objects, it would be strange if both bidder and sheriff might wholly disregard the certificate, and the sale be altogether uninfluenced by it. If, however, the last opinion we have been combatting was correct, it would be inapplicable to this case, since there is no evidence in the record that any part of the mortgage debt in question had been paid, and it is in proof affirmatively that, on the first of June, 1821, the sum of $8,597 principal was due, and the presumption is irresistible that up to this date a still larger sum was due. This sum, however, is above the amount which any of the tracts of land sold for, and it remained due until December, 1822, which was subsequent to all the sales from which the defendants derive their titles.

The formalities prescribed by law were not observed in the proceedings on which the defendants base their titles to the land sued for. The first seizure under the judgment of *John*, and *Leonard B. Compton* against the heirs of *I. H. Robinett*, was made on the 30th April, 1819, and the property offered for the first time on the 2d June following, leaving but thirty-two clear days, when there should have been at least thirty-four. In reference to the proceedings under this execution, the court say that "the sheriff does not say on what day he set up the advertisement ;" that "there were more than thirty days between the seizure and day of sale" (of the first exposure must be meant), and that an advertisement agreeably to law must be presumed in the absence of proof to the contrary. This presumption is contradicted by the return, if it was requisite to give notice of seizure, and allow for it a delay of three days, in addition to that required for advertising. We think the act of 1805 clearly requires both the notice and delay.

Under the second execution against the heirs of *Elizabeth Robinett*, the seizure and advertisement were both made on the 25th March, 1822. Under the first writ against the same parties, the seizure was made on the 3d October, 1821, and the advertisement on the next day. *Josiah S. Johnston* and *John P. McNeil* derived their title from these sales. *J.* and *L. B. Compton* acquired title to the land they hold under a sheriff's sale, made in obedience to a second writ of *fieri facias*, issued under their judgment. Under this writ the land was advertised on the 3d of August, and exposed to sale for the first time on the 2d September following, not allowing thirty clear days. See *McDonough* v. *Gravier's Heirs*, 9 La. 545. The court, in the opinion pronounced in this case, and the counsel for the defendants assert, that the practice of excluding the day of advertising and the day of sale was introduced under the Code of Practice. We are unable to discover any foundation for this position in the words of the article of the Code of Practice, when compared with those of the act of 1817 on the same subject. It is impossible to reconcile the language of the act with a sale on the thirtieth day ; a proposition not equally obvious in reference to the 670th article C. P. The language of the act, sec. 14, is that "no sale" of immovable property shall be made in less than thirty days from the day of advertising. The word "from" in its universal acceptation excludes entirely the thing to which it is applied. Exclude then the 3d of August, and it is impossible that a sale on the 2d September should not be in less than thirty days. There cannot intervene between the two periods more than twenty-nine days and a fraction. The article referred to (C. P. 670) provides that the sale of immovables can be made "only thirty days after the notice" of sale. Now a sale made at 1 o'clock, P. M. of the 2d September, would be thirty days after a notice given at 12 o'clock of the 3d August. If the court and the counsel meant simply to state a historical fact, we reply in the words of the decision pronounced in *Vignaud* v. *Tonnacourt*, "practice is never permitted to control the law."

This suit was brought, May 3d, 1825. Previous to its institution it had been decided, in *Vignaud* v. *Tonnacourt*, 12 M. R. 229 ; in *Dupey et al.* v. *Griffin*, 1 Mart. N. S. 198, and in several other cases, that Probate courts had exclusive jurisdiction of all claims against successions. The correctness of this decision has been recognised in every subsequent case in which the same question has been raised. In the case of *Tabor* v. *Johnson*, however, it was decided that sales were not void which were made under the authority of judgments against successions pronounced by courts of ordinary jurisdiction, notwithstanding the

incompetency of these tribunals. This decision was pronounced in June, 1825, and has been followed in every similar case ever since. 3 Mart. N. S. 674. In this case we find the following passage : " Allowing to the Courts of Probate exclusive jurisdiction in causes which appertain to estates administered by persons deriving authority from them either directly or indirectly, a question then arises whether this exclusion of the court of ordinary jurisdiction exists absolutely, ratione materiæ, or ratione personæ? We are inclined to think that the exclusive jurisdiction depends more upon the peculiar situation of the parties than on the subject matter of dispute, perhaps somewhat on both," p. 683. In these two sentences we have the grounds of the determination in that case, and in all of those which have followed in its wake. The question would have been more fairly stated, if instead of " exclusive jurisdiction in causes appertaining to estates &c." the court had said " exclusive jurisdiction of claims for money brought against estates," for such is the nature of the case.

Upon this subject we submit the following points : 1. The judgment of a court incompetent ratione personæ is null ipso jure, if the objection to its incompetency either has not been, or cannot be waived. 2. That District courts are without jurisdiction, ratione materiæ, of suits to recover debts from succession. 3. That to be without jurisdiction of claims against successions, is to be incompetent ratione materiæ, and it is unimportant whether the incompetency depends more on the peculiar situation of the parties or on the subject-matter of dispute. 4. That in fact the incompetency of courts of ordinary jurisdiction in the cases referred to, does not depend more upon the situation of the subject matter than of the parties, if not entirely upon the former.

The will of the legislature is equally law, and confers and revokes powers with equal efficacy, whether arrived at by implication or learned from express language. Doubts may exist in one case, which would not arise in the other, in relation to the intention of the legislature, but when that intention is clearly perceived, it must regulate the action of the court and settle the rights of the citizen, although ascertained in either mode. If, as is admitted in the case of Tabor v. Johnson, there are provisions of the Code of 1808 inconsistent with the cognisance of claims against successions by the courts of ordinary jurisdiction, these tribunals are divested of all power to adjudicate upon such claims as effectually as they could be by an express prohibition. That Code (p. 178, art. 137) provides, that curators of vacant estates shall not proceed to the payment of the debts of the estate until they have obtained the authorisation of the parish judge. This is not impliedly but expressly forbidding the payment of these debts, in obedience to the order of any other than the parish judge, and is virtually declaring that no other judge shall have the power to order their payment or authorise the sale of property to effect it. It is well settled that this provision is equally applicable to the representatives of estates not vacant. 1 Mart. N. S. 198. 3 Mart. N. S. 628, 674.

Let us suppose, then, that prior to the judgments on which the defendants base their title, the legislature had enacted, in the language of our Code of Practice, that "courts of Probate shall have the exclusive power to decide on claims for money brought against successions, &c." The case would be in substance the same as that now before the court.

I. The exclusion of District courts from the cognisance of claims against successions, was not designed as a personal benefit to those who had them in charge. The legislature could not have intended to make it optional with administrators &c. whether claims against successions should be decided upon by District or Probate courts. The considerations which required that the settlement of the estates of deceased persons should be confined exclusively to Probate courts, are altogether irreconcileable with the investment of such a discretion in the representatives of such estates. In Dupey v. Griffin's executors, the court said that, " heirs with benefit of inventory cannot by consent take away from courts of Probate their jurisdiction." 1 Mart. N. S. 200. See also Debuys v. Yerby, 1 Mart. N. S. 381. The omission then of the plaintiffs' tutors to except to the competency of the courts which pronounced the judgments relied upon by the defendants, cannot contribute in the slightest degree to the validity of those judgments. The case before the court differs in no material respect from what it would be if the exceptions had been formally taken in limine litis. The validity of this objection has been recognised when made for the first time before the appellate tribunal. See 1 Mart. N. S. 381.

Jurisdiction is the power of him who has the right to judge. C. P. 76.

ROBINETT
v.
COMPTON.

See 6 Peters, 709. This includes the power to confer upon the party, in whose favor judgment may be rendered, a right to the money adjudged to be due to him—the right to seize and sell the property of the unsuccessful party to satisfy the judgment. The want of jurisdiction is the want of power to hear and determine the cause—the want of the power to authorise a sale of property to satisfy the judgment that may be pronounced. That this is a correct statement of the legal consequences of the want of jurisdiction, so far as this case is concerned, will not be denied, and its truth is wholly independent of the question whether the incompetency is *ratione personæ* or *ratione materiæ*. District courts then are without the power to pronounce judgment against successions, and consequently to authorise the sale of effects belonging to them. The sales, therefore, under which the defendants acquired title to the land sued for were made without the authority of the law. Would not the law be inconsistent with itself to recognise as valid that which is done without its authority, and even against its prohibitions? for the interference of District Courts with successions is impliedly, if not expressly, prohibited by the provisions of the Code of 1808, already cited. The sentence of a judicial tribunal derives the force of a judgment solely from the legal power to pronounce it. The only difference between the two kinds of incompetency, on account of the person and on account of the subject matter, is, that a waiver of the former will sometimes cure the defect, whilst that of the latter never will. But if the former is not or cannot be waived, the effect must be the same, that is, the want of power to judge, the want of power to authorise a sale to satisfy a judgment. The sole reason why consent will not render valid the judgment of a court incompetent *ratione materiæ* is, that such consent cannot give jurisdiction. The ultimate, the only cause of the nullity of such a judgment, is the want of legal authority to pronounce it. This want of authority or jurisdiction may be the effect of different causes, but it is itself the cause of the want of validity in the judgment. In *Leonard* v. *Mandeville*, 9 M. 489, it was decided that a sale of land, authorised by a probate judge, was absolutely void, because the minor to whom the land blonged, as well as his tutor, was domiciliated in a different parish from that in which the order of sale was made. The incompetency in this case was clearly on account of the person. The court say in that case, that " the whole proceedings are *coram non judice*, and therefore void." In 1 Mart. N. S. 381 the court uses precisely the same language in reference to a suit against a succession brought in the District Court *coram non judice*, and why not the same conclusion?

II. A court is said to be incompetent *ratione personæ* when the defendant is not subject to its authority, and incompetent *ratione materiæ* when it has not the power to adjudicate upon the subject matter in dispute. Now in every case in which the question has arisen, it has been admitted that the ordinary tribunals have been excluded from jurisdiction of claims against successions. The claim is a debt, the subject matter itself of the suit, and to be without jurisdiction of the claim made in a suit, is to be incompetent *ratione materiæ*. It is travelling beyond the proper limits of the inquiry to investigate the reasons why the court is divested of jurisdiction of the claim.

The error we are combatting seems to have arisen from applying the phrase *ratione materiæ* to the subject matter of the suit, instead of the suit itself or cause. In the former sense it is tautological.

III. The exclusive jurisdiction of the courts of Probate of suits brought to recover money from successions does depend principally, if not entirely, upon the subject matter in dispute. The case of *Vignaud* v. *Tonnacourt*, (12 M. 229), is the first in which the question was raised, whether District courts could take cognisance of suits for debt against successions. It was decided against the competency of the tribunal, and the grounds of the exclusion are set forth in detail, but not one of these appertain to the " peculiar situation of the parties." All are applicable to the subject matter of the suit. In the opinion already pronounced in this suit it is said, that " the case of *Vignaud* v. *Tonnacourt*" just cited. " was the first that came up after the act of 1820." The court would seem to intimate by this language that this act was the ground of the determination in that case. If they do, they overlook the fact that the act of 1820 is not once alluded to, and that the decision rests entirely upon the provisions of the Civil Code of 1808. In the passage quoted from *Taber* v. *Johnson*, the court admits that the exclusion depends both on the peculiar situation of the parties and of the subject matter in dispute. Should not the conclusion, even upon

its own principles and mode of reasoning, have been that the exclusion was both *ratione materiæ* and *ratione personæ?* The suggested conclusion would not be the less true, if the grounds of the exclusion which relate to the parties were more numerous or more important than those which apply to the subject matter.

It is not necessary to resort to the doctrines of nullity to determine whether an act, done without the legal power to do it, can have any legal effect. If, however, they are appealed to, they will furnish no support to the position, that the judgments of courts without jurisdiction are valid until rescinded in an action brought for that purpose. The nullity by which they are vitiated is a nullity *ipso jure*, and not one by way of action. The principal distinction between them is, that the former is extrinsic and apparent, and therefore may be perceived on simple inspection; the latter on the contrary is concealed, and cannot be discovered without an investigation and the introduction of evidence extraneous to the instrument or proceedings which are vitiated by it. Such are error, fraud, violence, &c. Acts or proceedings, therefore, which are tainted by this species of defect, are held valid until declared void by a competent tribunal. The law recognises no object of a trial but the discovery of facts. Is it not, then, absurd to contend for the necessity of an action, when there are no facts to be ascertained? The extent of the powers of a tribunal is a question of pure law. The incompetency of a court is a radical and apparent vice, and its judgment is therefore stricken with nullity *ipso jure*. 7 Touil. pp. 614, 615, n. 521.

In connection with the question of jurisdiction, the rule *stare decisis* will be invoked and relied upon by the counsel for the defendants. This will be a safer course than to attempt to show by a legitimate deduction from just premises, that the decisions which they will cite against us are correct. The true office of this rule is to incline the scale of judicial opinion when balanced by doubts. In *Vignaud* v. *Tonnacourt.* 12 M. 231, the court say, "if our inquiries bring us to the result that the action cannot be maintained, the usage under the statute ought not to affect our decision, as practice is never permitted to control the law, though in doubtful cases it may serve to explain it." If the court, after an investigation of this subject, should still be in doubt, we expect a decision against us. But if it should appear clear to them, as it does to us, that the property of the plaintiffs has been sold without the authority of any tribunal having legal power to authorise its sale, an adherence to the decision in *Tabor* v. *Johnson*, and those which have followed it, would be sacrificing, to a comparatively subordinate rule, principles entitled to much higher consideration in the administration of justice—would, in other words, be awarding the property of the plaintiffs to the defendants, in order to preserve judicial consistency in error. If the property, sought to be recovered in this case, was sold under the authority of a court without jurisdiction, the title must still be in the plaintiffs (9 M. 489), and we think it the most imperative, the most sacred of all judicial obligations, to award the property in dispute to the party to whom it belongs. We do not think it comes within the legitimate scope of judicial power, or of judicial, legislative, and executive combined, to give one man's property to another for any purpose whatever.

*O. N. Ogden,* and *H. A. Bullard,* for the defendants. 1. The defendants show judgments, executions, and sheriff's sales, covering all the property claimed by them. These proceedings were regular, and create valid titles. 16 La. 554. 8 La. 423. 9 La. 592. 19 La. 309.

2. The judgments under which all the sheriff's sales were made, are not appealed from, and have acquired the force of the thing adjudged. 11 M. R. 607.

3. The District Court had jurisdiction of the suits against the widow and heirs of *I. H. Robinett, ratione materiæ,* and no exception *ratione personæ* was pleaded *in limine litis,* as it ought to have been, to have any effect. No such exception having been made, the court was obliged to decide the matters presented before it by the contesting parties, and its judgments are valid and binding. 8 Mart. N. S. 241. 3 Mart. N. S. 676. 6 Mart. N. S. 548. 9 Mart. N. S. 378.

4. By appearing, and contesting these suits, as heirs of *I. H.,* and *Elizabeth Robinett,* on the merits, the plaintiffs rendered themselves personally liable for their debts, and are bound by all their acts. Code of 1808, p. 162, arts. 96, 97. 2 Mart. N. S. 475.

5. The validity of the judgments under which the sheriff's sales were made,

ROBINETT
*v.*
COMPTON.

cannot be attacked collaterally. A direct action ought to have been brought. 16 La. 440. 11 Mart. 607. 2 Mart. N. S. 292. 2 La. 190.

6. As to the objection that in some of the sales relied on by the defendants, there were not allowed thirty days, exclusive of the day of advertising and the day of sale, we say that the rule for excluding both was introduced by the Code of Practice, long after these sales were made. The rule which prevailed at the date of these sales, was to exclude one day and include the other, and this will give all the delays required.

As to the objection that the property did not sell for the amount of the mortgage to *Clements*, we reply: 1st. That the amount of this mortgage debt, ascertained to be due by the judgment of *The Heirs of Clements* v. *The Heirs of Robinett*, was only $8,593 40, all of which was paid by the sale of other property. 2d. That the plaintiffs brought their suit on two grounds of nullity in the alienations made of their property, to which they ought to be confined, to wit: that the property was not sold for its appraised value, and that it was not sold by the Probate court. 3d. That the heirs of *Robinett*, when sued on the mortgage given by their ancestors to *Clements*, alleged that nothing was due thereon, and they ought not now to be permitted to argue, against their plea in the suit referred to, that the whole amount was due. 4th. That no issue should be permitted in this court, which was not raised in the court below, and which, if it had been there raised, might have been met with proofs from the defendants. In the lower court, the case turned entirely upon the two questions raised by the plaintiffs, *the only* questions raised by them, as to the legality of a sale of their property for less than its appraised value, or by any other authority than that of a decree of the Probate court.

If those sales are now to be set aside on grounds never dreamed of until the argument before this court, the most ancient titles in the State will prove the most insecure, because the practice under which they were acquired, in all cases of forced alienations, was precisely that under which the defendants claim.

The judgment of the court was pronounced by

EUSTIS, C. J. This case was decided by the late Supreme Court, in October, 1844, in favor of the defendants, in affirmance of the judgment of the court of the sixth district, which was rendered in 1825. On the application of the plaintiffs a re-hearing was granted, on one point *only*, and for the benefit of the defendants, *McNeil*, the succession of *Johnston*, and the *Comptons*, the judgment being considered as final as to the other parties, against whom no re-hearing was asked. Under the view which the court took of the case, a question arose as to the validity of certain sheriff's sales under which the defendants claimed, and the point on which the re-hearing was granted is thus stated by the counsel applying for it :

"That all the property sued for was, at the time of the respective sales under which the defendants claim, subject to a special mortgage in favor of *H. Clements'* heirs for the sum of $60,000, and the price bid at none of said sales was sufficient to satisfy the same."

It is urged that this mortgage had a preference over that of the judgment creditors, and that the property seized was not sold subject to the payment of it, and that the price for which the property was adjudicated not being sufficient to satisfy the amount there was no sale, and the property remained undivested in the original proprietor. The proceedings under which the sales were made were regulated by the laws which were in force previous to the enactment of the Code of Practice, in 1825. The mortgage creditor having been paid by subsequent sales of other property, included in the mortgage, or subjected to the payment of his debt, and never complaining that the sheriff's sales in the manner they were made caused him any detriment, nor objecting to the application of the proceeds to the extinguishment of debts other than that which was secured by the special mortgage, deprives the plaintiffs' demand to set aside

the sales, of all foundation in equity. Though the apparent encumbrance was for the sum of $60,000, the debt had been reduced by payments, and, at the time of the sales, did not amount to one-sixth of that sum, and the creditor, being perfectly secure, had no interest in preventing another creditor, though having a subordinate mortgage debt, from being paid by a sale of a portion of the property mortgaged. The question which we have to decide is, whether sales under those circumstances, without any collusion or fraud which we are able to detect, can be declared void at the instance of the debtor, under the jurisprudence which prevailed at the time they were made.

It appears that there was a good deal of difficulty in carrying into effect the provisions of an act of 1817, which was then in force concerning sheriff's sales. In the case of *Balfour* v. *Chew*, 4 Mart. N. S. 163, the statute underwent a thorough examination by the court, after having been several times under consideration in previous cases. The court, in giving their judgment in *Balfour's* case, say : " Although such, in our opinion, is the true meaning of the provisions on this subject, a question of infinitely more importance in the decision of this cause arises, and that is, how must this bid be made ? Must it be for the entire value, with the obligation to pay the previous mortgage out of it, or will It be sufficient to bid the value over and above the mortgage, subject to its payment? We think either mode will meet the requisition of the act. The statute provides that the sheriff, or other public officer making the sale, shall only receive from the purchaser the surplus for which the property shall have been sold over and above the amount of the special mortgage. On bidding the whole amount, then, no money is paid but that which remains after satisfying the mortgage. In bidding the surplus over the mortgage and with the obligation to discharge it, he only makes the deduction before the sale which he would and must make after. Any other construction, it appears to us, would be substituting words for things. There is no real difference between buying a thing for $3,450, to be paid the seizing creditor, with an obligation to discharge a previous mortgage for $6,000, or purchasing it for $9,450, $6,000 of which is to be retained to discharge that mortgage, and the balance to be paid to the creditor at whose instance the sale is made. The sum to be paid is the same; the time of payment is the same; the persons to whom the money is to be paid is the same ; and the law, in presuming the validity of the contract, must be the same, unless it overlooked facts in pursuit of verbal distinctions." We consider the sales under examination as having been made for the entire value, the price to have been comprised in one sum, with the assent of the mortgage creditor as shown by his subsequent acts, by the execution of the sale, by the delivery of the property sold, and the appropriation of the proceeds to the extinguishment of the judgments under which they were seized.

There is a previous decision in which a contrary doctrine is apparently recognised. *De Armas* v. *Morgan*, 3 Mart. N. S. 606. A careful consideration of that case rather fortifies the conclusion to which we have come. The nullity of the sheriff's sale was decreed in the interest of the mortgage creditor. The sheriff was the nominal party who represented all interests. The court in that case, say : " It is of the essence of every sale that there should be a price received, or to be received, by the vendor. Now, in the present case, whether we consider the plaintiff in the *fieri facias*, or the sheriff, as the vendor, there was no price received, or to be received, by either. The mortgage creditor cannot be considered as the vendor, nor the sheriff his agent, for the sale was

made without his participation, consent, or even knowledge. If the law interfered with his mortgage it could only be after securing his payment, and the present sale compels him to be satisfied, if it has any effect, with a part of his claim." In the present case as there was a price, and that price was paid in its appropriation to the reduction of the judgments, and the interests of the mortgage creditor have not been injured, who must be considered as assenting to the appropriation, we cannot pronounce the sales to be void under the established jurisprudence of the times in which they were made. No authority has been shown, nor reason given, on which such a conclusion can be based.

This is the only point on which the re-hearing was granted, and it is a question whether we are at liberty to consider the case as open on any other points. *Lawrence* v. *Young*, 1 Annual Rep. 298. We consider it as one rather of judicial propriety, than of power. But it is obvious that a very grave and palpable error must be made out, to authorise our interference with any matter which the previous court has decided, in a case under its own control.

The other point made by the plaintiffs in their petition for a re-hearing, on which no re-hearing was granted, was this: That in making said sales the formalities prescribed by law were not complied with.

The property referred to was not sold on the first advertisements, not bringing two-thirds of its appraised value, and was offered, after the usual notice, for sale at twelve months. The informality complained of is, that thirty days were not allowed from the day of the first advertising, in the advertisements of the first *proposed* sale, which preceded that of the adjudication, which was made to the defendants, the *Comptons*, on the second offering. In relation to this the court considered that the formalities of law were complied with, and that the time allowed was sufficient, and state as a fact that the rule of computation then existing in relation to time. was to exclude one day and include the other. It is admitted to be different since the Code of Practice. From the briefs before us, it appears, that this question was fully argued, and the prevalence of this mode of computing the term in sheriff's sales was asserted by the counsel for the defendants, in his brief, to be universal, before the adoption of that Code. By virtually refusing a re-hearing on this point, the court has again affirmed the existence of this rule. As it relates to a matter of practice under laws no longer in existence, with which that court is presumed to be familiar, we do not feel authorised, at this late day, to call it in question.

Without being called upon to concur in, or dissent from, any other portion of the opinion of the late Supreme Court, we can state that we consider the defendants' rights as resting exclusively on their subsequent purchases at sheriff's sales, and deriving no effect from the pretended sale from *Nelson Robinett* to *L. B. Compton*, of date the 19th January, 1818.

The judgment in this case stands affirmed.